## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| PATRICIA SANCO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 09 C 3701 |
| | ) Magistrate Judge Sidney I. Schenkier |
| MICHAEL J. ASTRUE, Commissioner of | ) |
| Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This case involves an appeal by the claimant and plaintiff,[1] Patricia Sanco, from a final

decision by the Commissioner ("Commissioner") of the Social Security Administration ("SSA"),

which affirmed the Administrative Law Judge's ("ALJ's") denial of her claim for disability

insurance benefits ("DIB"), pursuant to Title II of the Social Security Act ("Act"), 42 U.S.C. §

423(d). On February 1, 2007, Ms. Sanco filed a claim for DIB (Record ("R.") 111-13). The DIB

application alleged disability on the basis of asthma and degenerative disc disease with an alleged

onset date of December 31, 1996 (R. 111). Ms. Sanco last worked in 1996, but her earnings records

gave her sufficient quarters of coverage to remain insured through June 30, 2001 (R. 42). Ms.

Sanco's application for DIB was denied initially and denied again upon reconsideration (R. 43, 49).

Ms. Sanco filed a request for an administrative hearing on December 27, 2007, which was granted

on Mach 10, 2008. At the hearing on June 30, 2008, however, Ms. Sanco informed the ALJ that her

---

[1]When referring to Ms. Sanco, the Court interchangeably uses the term "plaintiff" to describe her status as a
party in this appeal; the term "claimant" is used to describe Ms. Sanco's status in the administrative proceedings giving
rise to this appeal.

attorney was not present. Because Ms. Sanco's counsel as well as medical documents prior to Ms. Sanco's date of last insured were missing, the ALJ postponed the hearing.

The next hearing took place on September 19, 2008. Ms. Sanco, represented by counsel, appeared at the hearing, as did Dr. James E. Radkee, a vocational expert. On October 1, 2008, the ALJ issued a written opinion denying Ms. Sanco's claim for benefits (R. 7, 20). Ms. Sanco filed a Request for Review and the Appeals Council denied this request on April 24, 2009 (R. 1), making this decision the final decision of the Commissioner under 42 U.S.C. § 405(g).

Ms. Sanco seeks reversal and remand of this decision based on the following claims of error by the Administrative Law Judge ("ALJ"): (1) the ALJ erred by failing to call a medical expert at the administrative hearing, pursuant to Social Security Regulation ("SSR") 83-20, to help determine the proper "onset date" of the alleged disability where there was little or no medical evidence in the record; (2) the ALJ erred by failing to explain the basis for the residual functional capacity finding contrary to SSR 96-8p and controlling case law in the Seventh Circuit; and (3) the ALJ erred by failing to consider all factors required by SSR 96-7p in assessing the credibility of her testimony related to her alleged impairments (Pl.'s Mem. at 1).

Each side has moved for summary judgment. Plaintiff's motion (doc. # 21) seeks reversal or remand, and defendant's motion (doc. # 23) seeks affirmance of the denial of DIB. The case is before this Court, pursuant to consent of the parties, as authorized by 28 U.S.C. § 636(c) (doc. ## 14, 17). After careful review of the administrative record and the pleadings, the Court finds that this case must be reversed and remanded.

2

I.

In subsection A, below, we summarize the governing legal standards applicable in this case. In subsection B, we discuss SSR 96-7p and SSR 96-8p, as they pertain to RFC assessments. In subsection C, we discuss SR 83-20 regarding onset date and when a medical expert should be called to testify.

A.

The federal regulations implementing the Act outline a five-step evaluation process for determining whether a claimant has a disability. 20 C.F.R. § 404.1520(a)(4). These steps, which must be evaluated sequentially, require the ALJ to determine: (1) whether the claimant is currently performing any "substantial gainful activity;" (2) whether the claimant's alleged impairment or combination of impairments is severe; (3) whether the claimant's impairment(s) meet(s) or equal(s) any impairment listed in the appendix to the regulations as severe enough to preclude substantial gainful activity; (4) whether the claimant is unable to perform his or her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4). A finding of disability requires an affirmative answer at either Step 3 or Step 5. 20 C.F.R. § 404.1520(a)(4). A negative finding at any step other than Step 3 precludes a finding of disability. *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir.2008). The burden of proof is on the claimant except for Step 5, where the Commissioner must prove that significant numbers of jobs are available in the national economy for an employee of the claimant's ability. 20 C.F.R. § 404.1520(g) (1).

On appeal, the Court may not decide facts anew, reweigh evidence, or substitute its own judgment for that of the ALJ. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir.2002). That said, while

3

judicial review of ALJ decisions "is deferential, it is not abject." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir.2010). We uphold an ALJ's decision if it is supported by substantial evidence; that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir.2009) (internal citations and quotations omitted). Although the ALJ is not required to address every piece of evidence or testimony presented, the Court "cannot uphold an administrative decision that fails to mention highly pertinent evidence, or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker,* 597 F.3d at 921 (internal citations omitted).

## B.

"Disability" is defined by federal regulation as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). "Substantial gainful activity" is work that can be performed in an ordinary work setting on a regular and continuing basis. SSR 96-8p, at *7. In order to establish disability, at Step 2 a claimant must demonstrate that he or she suffers from a "severe" impairment, *i.e.,* an impairment that "has more than a minimal effect on the ability to do basic work activities." SSR 96-8p. "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs." *See* SSR 88-3c (discussing *Bowen v. Yukert,* 482 U.S. 137, 146 (1987)). If an impairment is not severe enough to limit significantly the claimant's ability to perform most jobs, then, by definition, the impairment does not prevent the claimant from engaging in any substantial gainful activity. *See Bowen*; 482 U.S. at 146; *see also* SSR 88-3c.

4

The first step for an ALJ is to decide whether the claimant has a "severe" impairment that has more than a minimal effect on the ability to do basic work activities. If one or more severe impairments have been identified at Step 2 of the sequential evaluation, the ALJ then turns to Step 3 and considers whether the impairment(s) fall within the Listing of Impairments, found at 20 C.F.R. Pt. 404, Subpt. P, App. 1. If so, that determination mandates a finding of disability. If not, the ALJ next considers what, if any, residual functional capacity ("RFC") the claimant retains in spite of the severe impairment(s).

To determine RFC, the ALJ is required to make a function by function assessment based upon all the relevant evidence of an individual's ability to do work-related activities. SSR 96-8p. For an RFC assessment, relevant evidence is limited to medical evidence and must relate to "the impact of a disease process or injury on the individual." SSR 96-8p, at *2 n.5. Although the claimant is responsible for providing the evidence used to make the RFC finding, an ALJ is also required to "develop a complete medical history, including arranging for a consultative examination(s) if necessary and making every reasonable effort to help [a claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(3). Relevant evidence includes: medical history, medical signs and lab findings, effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms (including pain) that are reasonably attributed to a medically determinable impairment, evidence from attempts to work, the need for a structured living environment, and work evaluations, if available. SSR 96-8p, at *5.

An ALJ cannot express an RFC determination simply in terms of the exertional levels of work (*e.g.*, sedentary, light, medium, heavy, and very heavy), "because the first consideration . . . is

5

whether the individual can do past relevant work as he or she actually performed it." SSR 96-p, at *3. Past relevant work may include both non-exertional functions and exertional functions. The exertional levels reflect analysis of the impairment's affect on the physical ability to do certain functions. *See* SSR 96-8p, at *3, 5. But, determination of an RFC requires the ALJ to consider non-exertional factors that are "attributable to medically determinable impairments" or related symptoms, such as pain. *Id.* at *2. "When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." *Id.* at *3.

Once the adjudicator has made the functional assessment necessary to determine the RFC, this assessment must be explained so that others can "glimpse" the "reasoning behind" the determination. *See Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). *See also* SSR 96-8p. In particular, the RFC assessment must include "a narrative" discussion that: (1) describes how the evidence supports each conclusion, citing specific medical facts (*e.g.,* laboratory findings) and nonmedical evidence (*e.g.,* daily activities, observations); (2) describes the claimant's "ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis...."; (3)"describe(s) the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record"; and (4) describes how "any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, at *7. Where symptoms such as pain are alleged, the RFC determination must also: (1) discuss the objective medical evidence as well as the subjective complaints of pain and other lay observations,

6

if appropriate; (2) resolve any inconsistencies in the evidence as a whole; and (3) "set forth of a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." SSR 96-8p, at *7.

The RFC assessment also "must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other non-medical evidence." SSR 96-8p, * 7. "In instances" where "the adjudicator has observed the individual, he or she is not free to accept or reject that individual's complaints *solely* on the basis of such personal observations." *Id.* (emphasis in original). In other words, a credibility assessment by the ALJ is not sufficient, by itself, to reject subjective complaints related to symptoms. There must be some other basis for rejecting the credibility of the claimant in the record. *Id.* However, "an individual's statements about the intensity or persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p, at *1. Rather, the ALJ "must consider the entire case record" when determining the credibility of the individual's statements. *Id.*

> The adjudicator must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC. Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone.

*Id.*

Finally, in assessing RFC, the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment

7

standing alone may not significantly limit an individual's ability to do basic work activities, it may – when considered with limitations or restrictions due to other impairments – be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a "not severe" impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do. *See* SSR 96-7p, at *5.

## C.

To be eligible for DIB, a claimant must do more than establish the existence of a disability. A claimant also must show that he or she was insured for disability at the time the disability began – that is, at the onset date of the disability. *See* 20 C.F.R. § 404.320(b)(1)-(4) (2010). The onset date of disability is the "first day an individual is disabled as defined in the Act and the regulations." SSR 83-20 (1983 WL 31249, at *1). "A title II worker cannot be found disabled under the Act unless insured status is also met at a time when the evidence establishes the presence of a disabling condition(s)." *Id.* at *2; *see also id.* at *1. "In many claims, the onset date is critical; it may affect the period from which the individual can be paid and may even be determinative of whether the individual is entitled to or eligible for any benefits").

SSR 83-20 also set forth factors for an ALJ to consider in fixing the onset date for disability:

Factors relevant to the determination of disability onset include the individual's allegation, the work history, and the medical evidence. These factors are often evaluated together to arrive at the onset date. However, the individual's allegation or the date of work stoppage is significant in determining onset only if it is consistent with the severity of the condition(s) shown by the medical evidence.

*Id.* at *1.

## II.

8

Against this legal backdrop, we address the history of Ms. Sanco's claim.

**A.**

Ms. Sanco was born on September 22, 1950 (R. 25). Ms. Sanco is five feet one and a half inches and weighed 168 pounds at the time of the hearing in September 2008 (R. 25). Ms. Sanco is single and lives with her mother, who is 89 years old (R. 31). According to her testimony, Ms. Sanco does not perform any chores around the house (*Id.*). A landscaper has always taken care of the yard outside the home (*Id.*).

Between 1973 and 1995, Ms. Sanco worked for Zayre and for K-Mart in retail sales (R. 28, 132, 141). At both these places of employment, Ms. Sanco unloaded approximately 200 to 300 cases of merchandise weighing between 80 and 90 pounds off trucks, took "15 steps upstairs" to place merchandise in the stockroom, and sometimes unpackaged the merchandise and helped to display it on the counters (R. 27-28). Between 1995 and 1996, Ms. Sanco worked at Target as a cashier and door greeter (R. 26). Both assignments at Target required Ms. Sanco to sit and stand, and the cashier position further required that Ms. Sanco lift merchandise weighing up to 40 pounds (R. 27). Sometime during 1996, Ms. Sanco resigned from her position at Target and has not worked since (R. 26).[1] Ms. Sanco testified that she stopped working because she experienced great pain in her left leg and her back that extends into her toes (R. 27, 29).

Ms. Sanco testified that during that time period she experienced "excruciating" pain down her leg, which she attributed to problems with her sciatic nerve. According to Ms. Sanco, the pain radiated down her left leg into her toes and also affected her neck area. Because of this pain, Ms.

---

[1]Because the ALJ specifically requested that Ms. Sanco provide evidence regarding her disability prior to her date last insured, Ms. Sanco's attorney directed her to focus on the time period between "the summer of 2000 to the summer fo 2001" (R. 28).

9

Sanco said that she was sometimes locked in whatever physical position she was in at the time the pain started; and, sometimes, this pain would last for approximately 30 to 45 minutes (R. 29). Ms. Sanco also testified that the pain in her left leg "was so great" that she would lie down three to four times a day, for up to 20 minutes each time (R. 31).

Ms. Sanco testified that she was taking Quinine Sulfate and muscle relaxers to ease the pain (R. 28). According to Ms. Sanco, these medications were ordered by her treating physicians (R. 32); however, no orders for muscle relaxers are reflected in the treatment notes (R. 36). Ms. Sanco testified that the muscle relaxants made her tired, and adversely affected her ability to focus and concentrate (R. 30).

**B.**

Next, we review the objective medical evidence of Ms. Sanco's alleged physical impairments. On or about March 2, 1983, Ms. Sanco injured her lower back and leg on her job while lifting merchandise (R. 128). As a result of this injury, between March and October of 1983, Ms. Sanco temporarily was totally disabled (R. 126). On December 31, 1996, Ms. Sanco determined that, due to her asthmatic and back impairments, she should stop working. Ms. Sanco received a lump sum of $8,821.00 from her Meldisco/Melville Corporation to compensate her for medical, surgical and hospital expenses (R. 128).

In September 1999, Ms. Sanco visited Saint Joseph's Hospital with a complaint of back pain (R. 238). Treatment notes by Dr. M. Fry show that Ms. Sanco reported chronic low back pain, a herniated disc, asthma and hypertension, all of which were well controlled with medication (*Id.*). The treatment notes report that Ms. Sanco was placed on medication for her asthma and advised to "follow diet and exercise for a period of 2-3 months" to reduce her high blood cholesterol (R. 294).

10

In follow-up visits during August 2000 and February 2001, Ms. Sanco again complained of back pain, with "shooting pain" down her left leg and into her toes (R. 235). In March 2001, Ms. Sanco went to the outpatient center complaining of asthma related symptoms, which were treated with medication (R. 232-35).

In May 2001, treatment notes from the outpatient center indicate that Ms. Sanco had mild to moderate obstructive lung disease, for which she was given medication (R. 230). Ms. Sanco's obesity was also recorded in these treatment notes; she was advised to address that condition with diet and exercise (R. 229).

In December 2001, Ms. Sanco was treated again for asthma related symptoms, but treatment notes indicate that this condition was well controlled by medication (R. 227). Ms. Sanco's asthma was noted again by treating doctors on several occasions in 2006 and 2007; and medical findings reflect that she was prescribed medication each time she appeared for treatment (R. 199-235).

In March 2006, Ms. Sanco's was diagnosed for the first time with spinal stenosis (R. 207). The March 2006 report stated that Ms. Sanco had a complete block in her lumbar spine (R. 207). Treatment notes from this same year reflect that Ms. Sanco was found to have a severe degenerative disease and high grade spinal stenosis (R. 207).

On April 19, 2007, Dr. Scott Kale completed Ms. Sanco's consultative examination for the purposes of a disability determination (R. 283-87). Dr. Kale reviewed Ms.Sanco's medical records from Resurrection St. Joseph Hospital in August 2006 and January 2007. These records documented that Ms. Sanco had complained of a pain in her right shoulder, hypertension, asthma, and lumbar stenosis (R. 283). Dr. Kale noted that x-rays taken in August 2006 showed minor degenerative changes in Ms. Sanco's shoulder and severe degenerative changes with high-grade stenosis with an

11

almost complete block in Ms. Sanco's lumbar spine (*Id.*). An MRI scan of the lumbar spine on February 11, 2006, also indicated severe degenerative changes with high-grade stenosis and an "almost complete block at L4-L5 with significant stenosis at L2-L3 and stenosis at L3-L4" (R. 283). Based on these records, Dr. Kale concluded that Ms. Sanco had chronic low back pain with severe spinal stenosis at the time these tests were performed, and that Ms. Sanco's asthma was well controlled (R. 286).

On May 10, 2007, Dr. Henry S. Bennet completed a consultative examination for the SSA state agency regarding Ms. Sanco's alleged impairment of severe degenerate spinal disease, articular facet disease, a spinal block at L4-L5 level, numbness in legs, muscle spasms, sciatic nerve pain, asthma, hypertension, limited range of movement, cholesterol, high blood pressure and asthma (R. 288-90). The examiner denied the claim for "failure to cooperate or insufficient evidence" (R. 288). The examiner explained that the alleged onset was 12/31/96 and date last insured was 06/30/01. Based on those dates, the examiner concluded that there was "very limited medical evidence obtained" to "cover" that period. A bone scan on 10/08/99 did not reveal osteopenia or osteoporosis, no MRIs or x-rays or CT scans were available from that time period, and there were no reports of medical visits describing Ms. Sanco as suffering from pain or limited range of movement. On that record, the examiner concluded that there was "insufficient evidence to make a medical determination."

On October 15, 2007, Dr. Frank Jimenez completed Ms. Sanco's consultative examination for the purposes of a disability determination, based on Ms. Sanco's alleged impairments of asthma,

12

degenerative disc disease and obesity (R. 291).[2] Dr. Jimenez reviewed Ms. Sanco's records and documented that she had complaints of degenerative disc disease in the lumber spine, numbness in the legs, muscle spasms, sciatic nerve pain, asthma, and hypertension (R. 293). Dr. Jimenez concluded that Ms. Sanco had "[n]o significantly limiting condition ... present on or before 6/30/01" (R. 293), which was Ms. Sanco's last insured date.

## C.

We now turn to the administrative hearing record. In addition to testimony by Ms. Sanco, the ALJ heard testimony from a vocational expert ("the VE"). The VE testified to the skill and exertional level of plaintiff's past relevant work. The VE testified that Ms. Sanco's past work as a cashier was light and unskilled work (R. 38). The VE further testified that Ms. Sanco's work as a greeter, while not listed in the *Dictionary of Occupational Titles* ("DOT), was also light and unskilled (R. 38). The VE also testified that Ms. Sanco's job at K-Mart should be characterized as a "material handler," and this work was heavy and unskilled (R. 38). According to the VE, Ms. Sanco's past semiskilled worked did not transfer to sedentary work but was instead the lowest of semi-skilled work (R. 38).[3]

## III.

In a written opinion dated on October 1, 2008, the ALJ applied the sequential five-step analysis and found that Ms. Sanco was not disabled through June 30, 2001, the date last insured (R. 14). At Step 1, the ALJ found that Ms. Sanco did not engage in substantial gainful activity during

---

[2]On the issue of these two alleged impairments, the record does not explain why the doctor reviewed her alleged impairment of obesity. None of her disability applications list obesity as an alleged impairment.

[3]The ALJ never asked the VE any hypotheticals concerning the Step 5 inquiry: that is, whether there was other work in significant numbers in the national economy that Ms. Sanco could perform given her RFC.

13

the period from her alleged onset date of December 31, 1996 through June, 30, 2001, the last-insured date (R. 11). At Step 2, the ALJ found that through the last-insured date, Ms. Sanco had two severe impairments: asthma and degenerative disc disease. *Id.* The ALJ determined that these impairments caused limitations in the claimant's ability to engage in basic work activities. *Id.*

At Step 3, the ALJ considered whether Ms. Sanco's asthma and degenerative disc disease met or equaled a listed impairment (R. 11). The ALJ found that Ms. Sanco did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments through the date last insured (*Id.*). *First*, the ALJ found that there was no evidence showing that claimant's spinal disease resulted in nerve root involvement as described in Section 1.04 of Appendix (*Id.*). *Second*, the ALJ determined that Ms. Sanco did not show any significant ambulatory limitation as described in Section 1.00(B)(2), (*Id.*). The ALJ also found that Ms. Sanco's asthma, while treated with medication, did not lead to any attacks as frequently as required to qualify under Section 3.03 and that the record did not indicate that Ms. Sanco had any pulmonary function studies equivalent to those required by Section 3.02(a) (*Id.*).

The ALJ then determined that notwithstanding the severe impairments of asthma and degenerative disc disease, through the last-insured date of June 30, 2001, Ms. Sanco had the RFC to perform full range of medium work (R. 11). In making his finding, the ALJ first considered whether Ms. Sanco had an underlying medically determinable physical or mental impairment (R. 12). Relying on Ms. Sanco's testimony, the ALJ found that Ms. Sanco had a combination of impairments during the insured status period which could reasonably be expected to produce the alleged symptoms (*Id.*). The ALJ noted that Ms. Sanco had not worked since 1996 (*Id.*). Furthermore, the ALJ noted that Ms. Sanco did not experience "excruciating pain" in her neck and toes until 2000 or

14

2001 (*Id.*). Additionally, the ALJ cited Ms. Sanco' testimony that she started taking muscle relaxers to ease her pain, but was often left tired and had to lie down during the day (*Id.*). The ALJ also cited Ms. Sanco's testimony regarding her inability to move for 30-45 minutes because she was locked in a standing position, and Ms. Sanco's assertion that "she would not have been able to stand for any length of time during the period at issue" (*Id.*).

The ALJ next considered the extent to which the intensity, persistence and limiting effects of Ms. Sanco's symptoms limited her ability to perform basic work activities (R. 12). One this score, the ALJ found Ms. Sanco's testimony concerning the extent of her limitations was not credible for several reasons.

*First*, the ALJ found Ms. Sanco's statements regarding her exacerbated asthma lacked credibility because the medical treatment notes indicated that her asthma had always been "adequately controlled" (R. 12). Moreover, the ALJ noted that asthma was not mentioned as an impairment in the plaintiff's brief of September 18, 2008 (*Id.*). The ALJ further relied on the treatment note from August 28, 2000, where an examination of Ms. Sanco's lungs showed that they were "clear to auscultation and percussion" and that Ms. Sanco also had no "rales, rhonci, or wheezes" (*Id.* (citing R. 293-94)). Accordingly, the ALJ concluded that Ms. Sanco's claim of asthma was not limiting prior to the date last insured (R. 12).

*Second*, the ALJ considered whether Ms. Sanco's statements regarding the extent of her degenerative disc disease and back pain through her date last insured were credible. The ALJ first noted that while the medical record documented that Ms. Sanco had episodes of back pain prior to the date last insured, the record indicates that pain was "not unremitting" during this period (R. 12). Additionally, the ALJ determined that the only medical record indicating that Ms. Sanco experienced

15

serious back pain within the insured status period was from August 2000 (R. 12). In treatment notes that covered an entire physical exam, the doctor noted that Ms. Sanco complained of numbness in her toes and shooting pain in her back that went down her left leg and into her toes (*Id.* (citing R. 293-94)). However, the ALJ noted that subsequent nerve root studies were negative, and that the record did not contain any further medical evidence that Ms. Sanco sought medical assistance for back pain during the insured period (*Id.*). Finally, the ALJ found Ms. Sanco's testimony that she was given muscle relaxers unsupported by the medical record, which fails to show any prescription for or treatment with muscle relaxers (*Id.*).[4]

*Third,* the ALJ noted that the state agency determined Ms. Sanco had no severe impairments prior to her date last insured (R. 13). The ALJ found this determination reasonable. In so finding, the ALJ acknowledged that the state agency had found Ms. Sanco disabled as of the date of her application in February 2007 (*Id.*). The ALJ likewise also found that state agency determination to be reasonable (*Id.*). The ALJ – without further analysis – then went on to state that given Ms. Sanco's "combination of impairments prior to June 2001, it is also reasonable to limit her lifting, making the combination of impairments severe" (*Id.*).

*Fourth,* the ALJ assessed whether there should have been a medical expert at the hearing, pursuant to SSR 83-20, as requested by the claimant's representative (R. 13). SSR 83-20 states that a medical expert should be used if adequate medical records are not available when determining an onset date (*Id.*). The ALJ reasoned that because medical records were obtained from the insured status period, a medical expert was not needed to resolve the onset date (*Id.*). The ALJ explained

---

[4]Ms. Sanco testified that she was given samples; however, the ALJ found that testimony not credible because "typically medical records reflect that medication was ordered, even if samples are given" (R. 12).

16

that this was not a case where records could not be located; rather, this was a case where records were located, but they proved to be lacking the evidence Ms. Sanco needed to establish a disability (*Id.*). Accordingly, after considering the objective medical evidence, subjective testimony and medical opinions, the ALJ found Ms. Sanco's limitations to be "severe" as of her last insured date of June 30, 2001, but not did find that any further restrictions were justified in the RFC assessment for that time period (*Id.*).

Based on that RFC, at Step 4 the ALJ found that the claimant's past relevant work as a cashier and retail sales clerk were not "work-related activities precluded by the claimant's residual functional capacity" (R.13). The ALJ compared the residual functional capacity the claimant had as of the date last insured with the physical and mental demands of her past work. Because the VE testified that both of Ms. Sanco's occupations prior to her date last insured were light in exertional demand, and because the ALJ found that Ms. Sanco had an RFC that allowed her to perform the full range of medium work, the ALJ concluded that Ms. Sanco could perform her past relevant work. Accordingly, the ALJ found that Ms. Sanco was not disabled at any time from December 31, 1996, Ms. Sanco's alleged onset date, through June 30, 2001, the date last insured (*Id.*).

## IV.

As stated above, plaintiff seeks reversal or remand on a number of grounds. We begin our analysis with a discussion of one ground that is dispositive: the ALJ's determination of Ms. Sanco's RFC. We then discuss another issue embedded within the RFC determination that the parties have not raised, but that warrants the ALJ's close consideration on remand: that is, the determination at Step 2 that Ms. Sanco suffered from severe impairments as of June 30, 2001, the last date she was insured.

17

**A.**

At Step 2, the ALJ determined that Ms. Sanco suffered from two severe impairments as of June 30, 2001: asthma and degenerative disc disease (R. 11). Under the sequential analysis, that required the ALJ to determine at Step 3 whether those impairments met or equaled a Listing. The ALJ found that they did not (*id.*), a finding that plaintiff does not challenge.

As a result of that Step 3 finding, the ALJ was obliged to determine Ms. Sanco's RFC as of June 30, 2001, as the predicate for deciding whether Ms. Sanco could perform her past relevant work (the Step 4 inquiry) or, if not, whether there were a significant number of other jobs in the national economy she could perform (the Step 5 inquiry). Here, the ALJ decided that as of June 30, 2001, Ms. Sanco had an RFC that enabled her to perform the full range of medium work, based on a limitation in her ability to perform lifting (R.11-13). Based on that finding, the ALJ found at Step 4 that Ms. Sanco could perform her past relevant work, and thus determined that she was not disabled (R. 13).

The difficulty we have with the RFC analysis is the dearth of evidence or explanation to support it. The ALJ heard Ms. Sanco's testimony about her condition as of June 30, 2001 – testimony that she gave in September 2008, more than seven years after the fact. As the ALJ noted (R. 13), the medical evidence did support a finding of disability as of February 1, 2007 (the date Ms. Sanco filed her claim), due to severe degenerative changes and high grade stenosis with an almost complete block in Ms. Sanco's lumber spine (*see* R. 283). But, the only consultative examinations resulted in opinions that Ms. Sanco had "no significantly limiting condition" as of June 30, 2001 (R. 293). There was no contemporaneous medical evidence from 2000 or 2001 that reflected what, if any, exertional or other limitations Ms. Sanco experienced due to asthma or back problems.

18

In the face of this absence of evidence, it was not enough for the ALJ to state that "given the combination of impairments prior to June 2001, it is . . . reasonable to limit her lifting, making the combination of impairments severe" (R. 13). That conclusory statement does not even begin to build the necessary "logical bridge" between the record evidence (or lack of it) and the finding. We do not know what evidence the ALJ relied upon in determining what limitations Ms. Sanco experienced as of June 30, 2001. For example, we do not know whether – or to what extent – the ALJ inferred a level of limitation as of June 30, 2001 based on Ms. Sanco's condition in February 2007. If the ALJ did so, the record is bereft of any explanation to show that this kind of inference can be made from the record evidence and, if it can, how to do so. Nor do we know what specific medical evidence or what testimony of Ms. Sanco the ALJ relied upon in reaching the RFC determination. This failure to provide the explanation necessary for meaningful review requires a remand. *See* SSR 96-8p at *7. *See also Zurawski*, 245 F.3d at 889.

In defense of the RFC determination, the government argues that the ALJ merely "'erred' on the side of caution – to plaintiff's benefit – by finding" any limitation (Def.'s Mem. at 9). That argument fails to advance the government's position, because the ALJ did not say that was what she was doing. The ALJ specifically found that plaintiff had an RFC for medium work (R. 11), not that she was assuming that level of RFC *arguendo*. We must assess an ALJ's opinion based on what the ALJ said, and not on what the government suggests the ALJ might have said. *See, e.g., Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) (citing *SEC v. Chereny Corp.*, 318 U.S. 80, 93-95 (1943)) ("general principles of administrative law preclude the Commission's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ").

19

Accordingly, we conclude that the ALJ's determination of plaintiff's RFC is flawed, and thus a remand is in order.

**B.**

Because we remand on the basis of the ALJ's RFC determination, we do not address the other grounds for reversal or remand raised by plaintiff. However, our analysis of the RFC finding reveals another issue that the ALJ must address on remand: the Step 2 finding that Ms. Sanco suffered from severe impairments as of her last insured date of June 30, 2001.

The ALJ found – without discussion – that Ms. Sanco's asthma and degenerative disc disease were severe impairments as of June 30, 2001 (R. 11). Had the ALJ found that Ms. Sanco suffered from no severe impairments as of that date, a finding of no disability would have been required irrespective of her later condition. That is because, under SSR 96-8p, Ms. Sanco is ineligible for DIB unless her disability occurred on or before June 30, 2001. This required, at the threshold, that the ALJ pay close attention to whether, as of that date, Ms. Sanco had severe impairments that could provide the foundation for a finding of disability. The ALJ failed to do so.

*First*, while the ALJ found that Ms. Sanco's asthma was a severe impairment at Step 2 (R. 11), the ALJ cited to no medical evidence in support of that finding. Indeed, the ALJ later described the condition as "alleged asthma" and found the medical evidence showed it was adequately controlled with medication – so much so that the "alleged" condition was not even mentioned in Ms. Sanco's hearing brief (R. 12). Under the regulations, a severe impairment is one that "has more than a minimal effect on the ability to do basic work activities." SSR 96-8p. The ALJ does not explain what evidence led her to find the alleged asthma to be a severe impairment at Step 2.

20

*Second*, the ALJ's finding that degenerative disc disease was a severe impairment as of June 30, 2001 is equally bereft of explanation. If the ALJ found that the record evidence supported a finding of severe impairments, she was obligated to provide a logical bridge to explain why. *Parker*, 597 F.3d at 921. Instead, what the ALJ has provided is a leap of logic from the evidence that she recited, to a finding that does not clearly emanate from that evidence. The ALJ does not state what testimony by Ms. Sanco or what objective medical evidence she relied upon to support the finding that Ms. Sanco's back condition was "severe" – that is, had more than a minimal effect on her ability to perform basic work activities – as of June 30, 2001. Indeed, the ALJ found that the contemporaneous medical records "do not support her allegations" (R. 13). Moreover, a consultative examination specifically found that Ms. Sanco had "no significantly limiting condition . . . present on or before 6/30/01" (R. 293).

We recognize that the passage of time between Ms. Sanco's application on February 1, 2007 and her last insured date of June 30, 2001 may create some complexities of proof. We note that the ALJ concluded that a medical expert was not required under SSR 83-20, because the difficulty in this case for Ms. Sanco was not the absence of medical records from the period through the last date insured, but instead was that those contemporaneous medical records were available but did not support her claim. That said, use of a medical expert may be advisable on remand to provide the ALJ with guidance on questions such as whether degenerative disc disease has a predictable course and time line of progress, and if so, whether Ms. Sanco's condition as of February 1, 2007 allows reasonable inferences to be drawn about Ms. Sanco's condition as of June 30, 2001. We leave it open for the ALJ to engage such an expert on remand.

21

## CONCLUSION

For the foregoing reasons, the Court grants plaintiff's motion for remand (doc. # 21) and denies the Commissioner's motion for summary affirmance (doc. # 29). The case is remanded for further proceedings consistent with this ruling.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: September 23, 2010

22